```
                                          USDC SDNY
                                          DOCUMENT
                                          ELECTRONICALLY FILED
                                          DOC #: _____
                                          DATE FILED: SEP 1 2 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                                     :
UNITED STATES OF AMERICA                                             :
                                                                     :           14 Cr. 499 (KBF)
        - v. -                                                       :
                                                                     :           OPINION & ORDER
                                                                     :
ROBERTO HERNANDEZ et al.,                                            :
                                                                     :
                                       Defendants.                   :
-------------------------------------------------------------------- X

KATHERINE B. FORREST, United States District Judge:

On July 28, 2014, a grand jury returned an indictment against nine

individuals: Roberto Hernandez, Santos Robles, Alexis Reyes, Alphonso Lythcott,

Kenyatta Grant, Victor Perez, Wanda Aponte, Jennifer Vasquez, and Peter

Napolitano.  Each of the nine is charged with participating in a narcotics conspiracy

with the others; one, Alexis Reyes, is additionally charged with using, carrying, and

possessing a firearm in connection with that conspiracy.

Defense counsel, eight of whom were appointed pursuant to the Criminal

Justice Act ("CJA"), have requested that this Court appoint a tenth attorney to act

as a Coordinating Discovery Attorney ("CDA") on behalf of all nine defendants.[1]

According to defense counsel, this attorney would undertake the following tasks: (1)

act as a repository (or "way-station") for the receipt of electronic discovery; (2)

possibly index or "tag" such discovery (which requires some review); and (3)

determine, in collaboration with defense counsel, "whether additional support

---

[1] According to defense counsel, the Government proposed that a CDA be appointed in this case.

services are necessary or whether they can be address[ed] . . . within the context of [the CDA's] services." (ECF. No. 52.)

The appointment of CDAs is a relatively recent trend. In February of 2012, the Joint Electronic Technology Working Group ("JETWG")—a group comprised of representatives of the Administrative Office of the U.S. Courts' ("AO") Office of Defender Services ("ODS"), the Department of Justice ("DOJ"), Federal Defender Organizations ("FDO"), private attorneys who accept CJA appointments, and liaisons from the U.S. Judiciary and other AO offices—promulgated the "Recommendations for Electronically Stored Information (ESI) Discovery Production in Criminal Cases." These Recommendations, which address best practices for the cost-efficient management of ESI discovery between the Government and defendants in federal criminal cases, include a few limited paragraphs relating to CDAs. For example, the Recommendations state:

> In cases involving multiple defendants, the defendants should authorize one or more counsel to act as the discovery coordinator(s) or seek the appointment of a Coordinating Discovery Attorney and authorize that person to accept, on behalf of all defense counsel, the ESI discovery produced by the government. Generally, the format of production should be the same for all defendants, but the parties should be sensitive to different needs and interests in multiple defendant cases.

Dep't of Justice and Admin. Office of the U.S. Courts Joint Working Grp. on Elec. Tech. in the Criminal Justice Sys., Recommendations for Electronically Stored Information (ESI) Discovery Production in Federal Criminal Cases Recommendations 4 (2012), available at http://mow.fd.org/final-esi-protocol.pdf. The Recommendations do not set forth a list of tasks that may be delegated to a

CDA. They also do not address any legal or ethical issues that may be implicated with the appointment of CDAs. The Recommendations, of course, do not and could not modify any legal and ethical obligations that a criminal defense attorney owes to his or her client.

Over the past three years, an increasing number of courts have appointed attorneys to perform a variety of substantial discovery tasks as CDAs. See, e.g., United States v. Vujanic, No. 3:09-CR-249-D (17), 2014 WL 3868448, at *2 (N.D. Tex. Aug. 6, 2014) ("[T]he court has granted Vujanic's motion for approval of [CJA] funds so that Ms. Cadeddu can provide the same services as Coordinating Discovery Attorney as she provided to the numerous codefendants . . . . Vujanic will have the benefit of Ms. Cadeddu's extensive prior experience in this case when attempting to narrow his examination of the discovery that the government has produced." (emphasis added)); United States v. Shafer, No. 3:09-CR-249-D(05), 2011 WL 977891, at *6 (N.D. Tex. Mar. 21, 2011) ("Because of the volume of discovery in this case, the court appointed a coordinating discovery attorney to assist with discovery between the government and the defendants. The discovery attorney has arranged for key discovery provided by the government to be processed into a readable format and provided to defense counsel." (emphasis added)); United States v. Flores, No. CR 12-00119 SI, 2014 WL 1308608, at *1 (N.D. Cal. Mar. 28, 2014) ("A Coordinating Discovery Attorney, appointed by the Court, has assisted defense counsel in electronically organizing the documents received and maintaining a database which will allow for use of the materials at trial."); see also United States v. Ortiz, No. CR

3

12-0119 SI (LB), 2012 WL 5379512, at *1 (N.D. Cal. Oct. 31, 2012); United States v.
Sierra, No. 11 Cr. 1032(PAE), 2012 WL 2866417, at *2 (S.D.N.Y. July 11, 2012);
United States v. Collins, No. 11-CR-00471-DLJ (PSG), 2012 WL 3537814, at *6
(N.D. Cal. Mar. 16, 2012); United States v. Haney, No. 3:09-CR-249-D(03), 2011 WL
976786, at *5 (N.D. Tex. Mar. 21, 2011); United States v. Faulkner, No. 3:09-CR-
249-D, 2011 WL 976769, at *2 (N.D. Tex. Mar. 21, 2011). This Court has not found
a reported decision or hearing transcript in which a court appointing a CDA has
addressed the potential ethical and legal issues implicated by what appear to be
rather broad-ranging CDA appointments. The reported cases instead reveal an
array of tasks and potential involvement of CDAs in managing electronic discovery.
There is no one "CDA" set of responsibilities. There are clear and obvious ethical
and legal issues implicated by any court's appointment of an attorney to act on
behalf of multiple defendants in a criminal case.

   In this case, defense counsel have requested that the Court appoint Emma
Greenwood, Esq. to act as a CDA. After receiving the parties' request, the Court
held a conference to address legal issues necessarily implicated by the appointment
of a CDA in a multiple-defendant case. This Opinion & Order sets forth the Court's
determination with respect to that application.

   For the reasons set forth herein, the Court DENIES the application.[2]

---

[2] At the conference, the Court had indicated that it was willing to entertain the request to appoint a
CDA if appropriate safeguards were put in place. However, upon reflecting on the resistance the
Court received regarding its concerns and the stated desire of counsel to ask the CJA Panel to review
the Court's proposed order before further pursuing its application, the Court is concerned about the
attendant delays. The Court is unwilling to allow further delays in this case, and therefore has
modified its view.

4

<u>DISCUSSION</u>

Fundamental legal principles critical to adequate defense of a criminal charge form a backdrop to the Court's decision.  The U.S. Constitution provides that each defendant is presumed innocent until proven guilty.  See <u>Coffin v. United States</u>, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.").  Each criminal defendant enjoys a constitutional right to have effective assistance of counsel in confronting the charges against him.  See U.S. Const. amend. VI.  The law also provides that each defendant is entitled to the undivided loyalty of his attorney.  See <u>Cardoza v. Rock</u>, 731 F.3d 169, 183 (2d Cir. 2013) ("Where a criminal defendant has a Sixth Amendment right to counsel, he also has a 'correlative right to representation that is free from conflicts of interest.'" (quoting <u>Wood v. Georgia</u>, 450 U.S. 261, 271 (1981)) (internal quotation marks omitted)); <u>United States v. Carrigan</u>, 543 F.2d 1053, 1058 (2d Cir. 1976) (Lumbard, J., concurring) ("The right to effective representation by counsel whose loyalty is undivided is so paramount in the proper administration of criminal justice that it must in some cases take precedence over all other considerations, including the expressed preference of the defendants concerned and their attorney.").

Not all defendants in this case, or in any other case, necessarily share the same legal interests.  Each has an individual presumption of innocence; each has an individual right to effective assistance of counsel with undivided loyalty.  How, why,

when, and to what extent each defendant may have participated in events relevant to the crimes charged may differ.  Discovery may reveal that a defendant was "only present" at a particular time; or not present at all; or heavily involved; or minimally involved; or was giving orders; or was receiving orders; or withdrew from the conspiracy at a particular point in time.  In short, discovery reveals each defendant's story—a story critical to plea bargaining, deciding innocence or guilt, calculating offense levels, and determining the applicability of various enhancements and role adjustments, including adjustments for minor or leadership roles under the Sentencing Guidelines.  Discovery in a case often defines much of what is known about the events in question.

The law requires the Government to provide certain discovery to each defendant.  It is the increasingly voluminous electronic discovery incident to Title III wiretaps, seized computer hard drives, cellphone data, and the like, which lead us to the present issue.  How is defense counsel to handle and manage such voluminous discovery?  This issue is particularly acute in cases with multiple defendants where discovery may have increased in volume and complexity with each additional defendant.  It is often the case that the greater the number of defendants and/or the longer the investigatory timeframe, the greater the mass of electronic materials.  Handling and managing this mass of materials is especially challenging for CJA-appointed counsel, who are provided limited resources and who operate under pressure to keep costs as low as possible.  Duplicating truly

ministerial tasks makes little sense; achieving appropriate efficiencies is to be applauded.

It would seem, then, that central management of ESI only makes sense. Indeed, there is no doubt that centralization of electronic discovery may be beneficial in appropriate cases, provided that necessary safeguards are in place. This appears to be the origin of the concept of a CDA: a person appointed to assist with centralizing discovery and achieving efficiencies where possible. Important issues arise, however. This Court's attention is keenly focused upon the fact that CDAs are attorneys. The appointment of an attorney in any criminal case should be carefully scrutinized. Everyone would readily agree that attorneys owe a duty of undivided loyalty to each of their clients. How, then, does the appointment of an attorney (CDA) to manage discovery on behalf of multiple defendants in one case square with this duty? If defense counsel-of-record delegates discovery tasks for his or her client to a CDA, what are the legal implications?

Implications exist even with respect to the most basic delegation of responsibility: having a CDA act as a "repository" of discovery. What, precisely, would the CDA be doing in that regard? Where are the CDA's duties written down for posterity? The law is clear that at no time can any defense counsel relinquish sole and absolute responsibility for ensuring that all discovery he or she was told would be provided has in fact been provided. Every defense counsel must ensure that he or she has access to his or her client's full story. No attorney can be designated to bear that responsibility on behalf of more than one defendant without

7

a Curcio hearing. And no additional (here, tenth) attorney can be appointed, without a Curcio hearing, to bear that responsibility on behalf of all defendants. See United States v. Curcio, 680 F.2d 881, 887 (2d Cir. 1982) ("'(A) possible conflict inheres in almost every instance of multiple representation,' in part because the interests of the defendants may diverge at virtually every stage of the proceeding." (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980))). None of this is to imply that individually responsible counsel acting on behalf of individual clients may not or should not coordinate trial or even pre-trial strategy. Such coordination occurs frequently, and it is often critical to a just outcome. The point, rather, is that counsel-of-record for a particular defendant must at all times, in all ways, remain ultimately responsible for providing effective legal representation to his or her client. This duty does not disappear during the discovery process.

A "CDA" is, therefore, a confusing and perhaps misleading designation. A CDA is an attorney, yet it is unclear whether the CDA is ever expected to act as an attorney—and, if so, on whose behalf. A CDA is not intended (or suggested by counsel here) to participate in strategic coordination among counsel for co-defendants. Rather, he or she would be performing tasks that each individual defense counsel would otherwise perform, but would be doing so on behalf of all defendants. If a CDA, as an attorney, will represent the defendants' legal interests in any manner, then he or she will have responsibilities to all defendants at the same time. The Court cannot appoint such an attorney without conducting a Curcio hearing. See Curcio, 680 F.2d at 890 ("[T]he court should advise the defendant of

8

his right to separate and conflict-free representation, instruct the defendant as to problems inherent in being represented by an attorney with divided loyalties, allow the defendant to confer with his chosen counsel, encourage the defendant to seek advice from independent counsel, and allow a reasonable time for the defendant to make his decision.").

If, on the other hand, a CDA will not act as an attorney, then one wonders why a CD-"A"—that is, an attorney—should be appointed to this position at all.[3] Indeed, appointing an attorney to centrally manage discovery only serves to raise serious concerns.

The Court perceives two main reasons to seek appointment of an attorney, rather than a non-attorney vendor (which would make more sense for a purely ministerial role and be less confusing), to centrally manage discovery: preserving attorney-client privilege and delegating responsibilities the performance of which requires legal training. Both of these reasons raise difficult questions.

If a CDA is appointed to protect attorney-client privilege, then the assumption must be that the CDA will have <u>clients</u> who hold that privilege. The clients must be the criminal defendants themselves, which means that the CDA will enter into attorney-client relationships with multiple defendants, triggering the concerns surrounding multiple representation.

---

[3] The Court notes that the attorney suggested by counsel to fulfill the role of a CDA in this case—Emma Greenwood—is a skilled lawyer. The Court in no way suggests in this opinion that Ms. Greenwood is not skilled. Indeed, it is her very skill as an attorney that serves to highlight the Court's concern that her appointment is sought because of her legal abilities.

9

A similar problem arises if the CDA is sought to assume responsibility for substantive tasks in managing discovery in a criminal case with multiple defendants. Virtually any task in a criminal case may have substantive aspects. A CDA might, for instance, be requested (1) to ensure that all discovery is received and loaded into one or more databases for review; (2) to tag or otherwise index discovery databases (this almost always requires some number of lawyer-driven considerations as to what categories to tag or index); (3) to search the materials provided in discovery for particular information; and (4) to review and analyze materials provided in discovery.

Examples of how these tasks may have substantive implications for a defendant are useful to identifying potential issues. Let us suppose the Government produces twelve disks in discovery, but the CDA mistakenly loads only nine disks onto the server.[4] The mistake of the three unloaded disks may go unnoticed until trial or some other important inflection point in a case (e.g., expiration of a plea offer). Suppose that only then does defense counsel-of-record realize that the disks were never loaded, and that they contained information beneficial to his or her client. Imagine that this information told a fuller story about this particular client. Imagine that had the fuller story been disclosed in court, this defendant's asserted defenses would have suddenly become more credible to the jury; or that the fully story, if revealed in discovery, would have altered the defendant's consideration of

---

[4] It may well be that all counsel received a cover letter indicating that twelve disks were sent. From defense counsel's perspective, they have assured themselves that discovery has been received. Of course, that is so because defense counsel are not directly responsible for loading the disks onto the server. The Court assumes that the CDA also will not personally load disks onto servers; the CDA likely will have technical assistance.

10

whether to plead guilty. The inability to tell, or even have access to, such a story plainly would be an unjust outcome.

Who, in this situation, is responsible for this failure in the discovery process? The counsel-of-record or the CDA? Does the CDA bear any responsibility to the individual defendant who was adversely affected by an error occurring under the CDA's supervision?

Technology vendors, who might also be hired to manage discovery, are simply different from CDAs. First, unlike the unknown technical capabilities of a law firm, a vendor's technical capabilities may be readily understood and relied upon. Second, a vendor typically enters into a contract with participating parties, ensuring clarity of roles and responsibilities and an individualized agency relationship. Finally, and most importantly, a vendor cannot be confused with a lawyer; there is no risk of a later-made ineffective-assistance-of-counsel claim against a vendor. The vendor's failures in the discovery process are clearly the problem of the counsel-of-record.

Let us take another example. Suppose the Government produces five voluminous databases of information and the parties ask a CDA to "tag" them. "Tagging" may involve any number of categories corresponding to substantive issues in a case. Among other categories might be identifying participants in intercepted calls, separating calls into particular events or date ranges, or marking code words for certain narcotics. Errors in the tagging process can have serious implications for a criminal defendant's case. What if certain participants in a call are not tagged? What if they are wrongly tagged? Listening to all calls might reveal such errors at

an early point in time.  But is that likely?  And what if a piece of evidence does not on its face require listening to each call, but instead is simply summary statistics?  Erroneous tagging could link a defendant to calls in which he never participated or to narcotics that he never possessed or distributed.  Who bears the responsibility for these failures?

Delegating to a CDA the responsibility of running searches against databases—not something clearly at issue in this case but a task that other courts have asked CDAs to perform—may result in even more obvious and serious issues.  In many large cases with multiple defendants and voluminous electronic discovery, multiple databases must be searched.  Lawyers familiar with large ESI productions undoubtedly have encountered instances in which not all databases they have requested to be searched were in fact searched.  Errors are inevitable.  Who is responsible when a CDA makes such an error?  If a CDA is searching for a defendant, does the CDA know enough about aliases or street names to do so effectively?

Other tasks are, of course, potentially even more problematic: having a CDA interface with the Government in more than a "mail drop" capacity; negotiating discovery; seeking additional discovery; conducting substantive document review.  These tasks plainly are those of an attorney acting <u>as an attorney</u> on behalf of multiple defendants simultaneously.  There is no "<u>Curcio</u> exception" just because an attorney is appointed as a "CDA."

Is there, then, a role for a CDA in a high-ESI volume, multiple-defendant case? There may be, with safeguards and an appropriate hearing.[5]

If a CDA clearly is not acting as an attorney, then—since a CDA is an attorney—the relationship must be clearly defined and explained to each defendant (who might otherwise wonder why an attorney who is performing tasks on his or her behalf is not his or her attorney). The very need to so carefully define the role of the CDA begs the question of why parties need to hire an attorney at all. A vendor with an arms-length contract is clearly preferable. But, assuming that the parties seek a particular person, who happens to hold a juris doctor degree, to assist with coordinating the technical aspects of discovery, a stipulation or other legally binding document should be entered which makes at least the following things clear:

1. Defense counsel are fully responsible for ensuring that all discovery produced by the Government is in fact received.

2. Defense counsel are fully responsible for ensuring that all discovery is loaded onto a server or otherwise made accessible.

3. Defense counsel are fully responsible for ensuring that all discovery is received in a form useful to their clients.

---

[5] In particular, the Court notes that the AO anticipates that a CDA could be one of the counsel-of-record who agrees to serve as a central repository of information produced in discovery, secure the necessary technological support to organize discovery, control costs by seeking low-cost vendors, and pursue cost-sharing opportunities with the Government. See Theodore J. Lidz, Services of Coordinating Discovery Attorneys Available in Selected Federal Criminal Justice Act Cases 1 (2012), available at http://www.ohnd.uscourts.gov/assets/Attorney_Information/Appointment_of_Counsel_CJA/CoordinatingDiscoveryAttorneys.pdf. As stated, these tasks are narrow, and generally may not present serious issues. However, to the extent any task involves more than convenient coordination, there is no analytical or legal reason it could not conceivably raise the issues to which the Court refers above. A certain amount of task delegation among counsel in a multiple-defendant case does and should occur, but all roles and responsibilities must always be clear and respected.

13

4. Defense counsel are fully responsible for any tagging or indexing.

5. Defense counsel are fully responsible for reviewing and searching all discovery materials.

6. Defense counsel are fully responsible for any failure in their clients' discovery processes.

7. The CDA will not assume any responsibilities of an attorney in her role as a CDA.

8. The CDA will not negotiate any discovery issue with the Government.

9. None of the CDA's communications will be covered by the attorney-client privilege.

An additional issue relates to scheduling. Counsel-of-record must always be responsible for meeting the Court-ordered schedule. It would be unacceptable to have counsel explain that an extension is needed because of a CDA's delay in, for instance, loading disks or finishing tagging. While this problem might arise with a vendor, the status of the CDA as an attorney alters the amount and nature of pressure that the parties might otherwise apply to meet deadlines. In this case, a scheduling issue has already arisen: defense counsel stated at the last conference that they would be unable to proceed with the motion schedule previously set by the Court because the Government had relied upon the appointment of a CDA and had not provided the discovery on the Court-ordered schedule. This problem should not have occurred.

Two final issues: The Court notes that counsel-of-record raised the cost of a hard drive as a factor in favor of appointing a CDA. The Court's review of hard drive costs indicates that these costs have declined very significantly; a five-terabyte hard drive costs about $200. Finally, the Court notes the important need to ensure that defense counsel not "lose the thread" of how to handle and manage electronic discovery. A clear benefit of managing one's own discovery, in addition to the benefits set forth above, is that managing large ESI cases will not become an unduly specialized task. Indeed, if CDAs were routinely appointed in large cases, defense counsel would inevitably start to argue that the technology has "gotten away from them." The interests of criminal defendants require that this not occur.

Accordingly, the application to appoint a CDA in this case is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 52. The Court will issue a separate order with a revised motion schedule.

SO ORDERED:

Dated:      New York, New York
            September 12, 2014

_____
        KATHERINE B. FORREST
        United States District Judge